

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DR
F. #2018R00551

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 16, 2022

By ECF

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Azamat Bobomurodov
               Criminal Docket No. 21-593 (ARR)

Dear Judge Ross:

      The government respectfully submits this letter in advance of the defendant Azamat Bobomurodov's sentencing. The defendant pled guilty to an information charging him with one count of failure to file export information, in violation of Title 13, United States Code, Section 305. As set forth below, the Court should impose a sentence within the United States Sentencing Guidelines (the "Guidelines") range of 6 – 12 months, which is sufficient, but not greater than necessary, to achieve the goals of sentencing.

I.     Factual Background

    A.     The Regulatory Scheme

      The Secretary of Commerce has the authority to collect information from persons exporting goods from the United States. 13 U.S.C. §§ 301 et seq. The Foreign Trade Regulations ("FTR") authorize the Secretary of Commerce, with the concurrence of the Secretary of State and the Secretary of Homeland Security, to publish regulations mandating that all persons engaged in the export of commodities file information regarding exports via the Automated Export System ("AES") for all shipments where a Shipper's Export Declaration ("SED") was previously required. 15 C.F.R. § 30.1. AES is the electronic system for collecting information from persons exporting goods from the United States.

      The FTR further authorizes the Secretary of Commerce to issue regulations regarding the imposition of civil and criminal penalties for violations of these regulations. 15

C.F.R. § 30.1(a). The FTR has declared that electronic filing through the AES strengthens the U.S. government's ability to prevent the export of certain items to unauthorized destinations and end users, because the AES aids in targeting, identifying and, when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

In addition, with respect to commodities shipped under a single commodity designation code with a value of more than $2,500, the FTR provides that an Electronic Export Information ("EEI") must be filed through the AES by, among others, the United States Principal Party In Interest ("USPPI") for all exports of physical goods. 15 C.F.R. §§ 30.2(a)(1), 30.37(a). The USPPI or its authorized agent has the responsibility to submit complete, correct information in AES based on personal knowledge of the facts or on information furnished by the parties to the export transaction. 15 C.F.R. §§ 30.3, 30.9.

B. The Instant Offense & Procedural History

In violation of this regulatory scheme, the defendant and his co-conspirators were part of a sophisticated network that smuggled millions of dollars' worth of electronics—including stolen property—from the United States primarily to Russia, via Aeroflot Airlines ("Aeroflot"). PSR ¶ 4. The defendant and his co-conspirators have operated this network by, among other things, smuggling merchandise through airline passengers and, at times, Aeroflot employees.[1] PSR ¶ 4.

Beginning in 2017, law enforcement noticed a trend among Aeroflot crewmembers transporting numerous electronic devices from John F. Kennedy International Airport in Queens, New York ("JFK") to destinations outside the United States, primarily to Moscow, Russia. PSR ¶ 8. Searches of these crew members revealed that they were transporting high-value Apple products, including iPhones, iPads, and Apple Watches. PSR ¶ 8. The devices were ordinarily acquired in the United States and transported abroad by crewmembers for resale in an effort to, among other things, avoid reporting requirements imposed by the laws of the United States. PSR ¶ 8.

Each of the co-conspirators had distinct roles in smuggling over $50 million worth of goods out of the United States. PSR ¶ 9. Leaders of the conspiracy would arrange for multiple airline employees to travel to the United States, pick up merchandise (often stolen), and smuggle it back to Russia. PSR ¶ 9. United States-based wholesalers supplied many of the products, knowing that they were helping the smuggling efforts in violation of exporting laws. PSR ¶ 9. Other individuals, including the defendant, received money in the United States and

---

[1] The U.S. Department of State has revoked the visas of 113 Aeroflot Airlines employees, each of whom has participated in the criminal schemes discussed herein.

2

acquired the electronics to be smuggled. PSR ¶ 9. These products would then be provided to couriers who would routinely fly into the United States for the purpose of smuggling back hundreds of thousands of dollars' worth of Apple electronics. PSR ¶ 9.

The smuggling trips—hundreds in all, sometimes conducted on a daily basis—involved suitcases filled with Apple products, at times hundreds per trip. See PSR ¶ 10. For instance, one Russian-based smuggler frequently used by members of the conspiracy, flew out of JFK on June 2, 2019, with approximately $195,000 worth of electronics in his luggage. PSR ¶ 10. Nine days later, on June 11, 2019, this courier was again found smuggling approximately $86,000 worth of electronics out of the United States to Russia. PSR ¶ 10. He returned to the United States less than a week later, on June 17, 2019 and, with the assistance of co-conspirators, who provided him with more goods, flew back to Russia on June 18, 2019, this time with approximately $218,905 worth of electronic devices. PSR ¶ 10. Other (by no means exhaustive) examples include a July 19, 2019 trip, where agents observed a co-conspirator assisting a courier load nine suitcases for an impending smuggling trip. See PSR ¶ 10. After the courier checked the suitcases at the airport, agents searched them, discovering approximately 328 Apple electronic devices, with a conservative market value of about $220,000. PSR ¶ 10.

The unique identifying numbers of the electronic devices found in the co-conspirator's suitcases transported or caused to be transported by the co-conspirators confirmed that a portion of the devices in the suitcases were stolen. See PSR ¶ 11. In addition, none of the defendants transporting the devices declared the merchandise in the requisite export forms, as required by law when exporting over $2,500 of a type of commercial merchandise. See 13 U.S.C. §§ 305(a)(1) and 504(a); 15 C.F.R. § 30 et seq.

During the time period of the conspiracy, the defendant is accountable for at least $500,000 in electronic devices being illegally exported from the United States to Russia as part of the above-described scheme. PSR ¶ 12. As part of his role in the scheme, the defendant was paid to acquire iPhones and other Apple electronic devices to be smuggled overseas. The defendant would then purchase the electronics, including electronics that he knew to be stolen, and deliver them to his co-conspirators. The defendant was surveilled at the airport on several occasion with co-conspirators checking in 5-6 suitcases for flights from JFK to Russia. The defendant also purchased flights and paid the baggage fees for couriers who were smuggling the electronics out of the United States. For example, the defendant purchased airline tickets for two couriers who suitcases were searched during their trip and were found to contain approximately $119,080 and $125,700 worth of electronics, respectively. See Gov't PSR Objections.

On December 13, 2021, the defendant pled guilty before this Court pursuant to a plea agreement to the sole count of the information, charging him with a violation of Title 13, United States Code, Section 305.

II. The Guidelines Calculation

The government agrees with the Guidelines calculation as set forth in the PSR:

| | |
|---|---:|
| Base Offense Level (§ 2M5.1(a)(2)) | 14 |
| Less: Minor Role (§ 3B1.2(b)) | -2 |
| Total: | __12__ |

This offense level, with a Criminal History Category I, plus a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), carries a Guidelines sentencing range of 6 to 12 months' imprisonment.

III. Analysis

The government respectfully submits that a sentence within the Guidelines range is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). As the Court is aware, an appropriate sentence should, among other things, reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. See 18 U.S.C. § 3553(a)(2)(A). In addition, an appropriate sentence should take into account the history and characteristics of the defendant, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. Id. § 3553(a)(1)-(2). In weighing these factors, "a district court has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" United States v. Rigas, 583 F.3d 108, 114 (2d Cir. 2009) (quoting United States v. Sanchez, 517 F.3d 651, 660 (2d Cir. 2008)).

The Section 3553(a) factors weigh in favor of a sentence within the applicable Guidelines range. Here, the defendant knowingly participated in a multi-million-dollar scheme to smuggle goods outside of the United States to Russia. The defendant helped acquire at least $500,000 in merchandise, including merchandise he knew to be stolen, which he provided to his co-conspirators with the intention that the products would be smuggled outside of the United States in violation of the nation's export laws. In addition, the defendant ensured the products would be smuggled to Russia by paying for flights and baggage fees for the couriers. The covert nature of the scheme—packing suitcases with thousands of dollars' worth of electronics—was employed by the defendant and his co-conspirators to conceal the nature of their activity because they knew it was in violation of the law. The export control laws are in place to protect the national security, foreign policy, and economic interests of the United States, all of which was undermined by the actions of the defendant and his co-conspirators.

The government respectfully submits that a Guidelines sentence will reflect the seriousness of the offense, adequately punish the defendant for his crime and will provide both

general and specific deterrence.  A Guidelines sentence would be sufficient but not greater than necessary to achieve the goals of sentencing.

    IV.    <u>Conclusion</u>

For the reasons set forth above, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range.

Very truly yours,

BREON PEACE
United States Attorney

By:   /s/ Dana Rehnquist
        Dana Rehnquist
        Assistant U.S. Attorney
        (718) 254-6029

cc:     Clerk of Court (ARR) (by E-mail)
        Victor L. Shulov, Esq. (by ECF and E-mail)
        Probation Officer Jennifer Baumann and Robert Houlton (by E-mail)